Shawn L. Morris, Esq.
Nevada Bar No. 6753
Zachariah B. Parry, Esq.
Nevada Bar No. 11677
WOODBURY, MORRIS & BROWN
701 N. Green Valley Parkway, Suite 110
Henderson, Nevada 89074
(702) 933-0777
smorris@wmb-law.net
zparry@wmb-law.net
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| PAINTERS JOINT COMMITTEE, through its designated fiduciaries, John Smirk and Thomas Pfundstein; IUPAT INDUSTRY PENSION FUND; EMPLOYEE PAINTERS TRUST HEALTH & WELFARE FUND; PAINTERS VACATION-HOLDIAY SAVINGS FUND; PAINTERS INDUSTRY PROMOTION FUND; PAINTERS JCIP FUND; PAINTERS ORGANIZING FUND; and PAINTERS LABOR MANAGEMENT CONTRACT FUND;<br><br>Plaintiffs,<br>vs.<br><br>J.L. WALLCO, INC. dba Wallternatives, a Nevada corporation; GENUINE QUALITY COATINGS, INC., a Nevada corporation; SUNRISE PAINTING/RCH, INC., a Nevada Corporation; RICHARD REJAN NIETO, individually and dba Genuine Quality Coatings, Inc.; CLAUDIA BAMMER aka Claudia Nieto, and individual; RICHARD RAOUL (AKA RQOUL) NIETO, an individual; GREAT AMERICAN INSURANCE COMPANY; JOHN DOES I-XX, inclusive; and ROE ENTITIES I-XX, inclusive;<br><br>Defendants. | CASE NO.   10-CV-1385-JCM-PAL<br><br>**MOTION FOR SUMMARY JUDGMENT** |

COMES NOW, GENUINE QUALITY COATINGS, INC., SUNRISE PAINTING/ RCH, INC., RICHARD REJAN NIETO, CLAUDIA BAMMER, and RICHARD RAOUL NIETO (together, "Defendants"), by and through the undersigned counsel of the law firm of WOODBURY, MORRIS & BROWN, and moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) because there exists no genuine issue of material fact.

This Motion is made based upon the pleadings and papers on file herein, the points and authorities submitted herewith, the affidavit attached hereto, and any oral argument that the Court may entertain should the Court decide to hold a hearing of this matter.

DATED: this 6th day of October 2010.                    WOODBURY, MORRIS & BROWN

                                                               /s/ Zachariah B. Parry
Shawn L. Morris, Esq.
Nevada Bar No. 6753
Zachariah B. Parry, Esq.
Nevada Bar No. 11677
701 N. Green Valley Parkway, Suite 110
Henderson, Nevada 89074
*Attorneys for Defendants*

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **STATEMENT OF FACTS**

Richard Raoul Nieto ("Richard") is an individual who has worked in the painting industry since 1946. In the years preceding 2005, Richard worked for various painting companies in various capacities. Because he had extensive experience as a manager and estimator, Richard decided to start his own company. On January 28, 2005, he incorporated Sunrise Painting/RCH, Inc. ("RCH") to that end. However, Richard never acquired a license, and therefore never started his business. Apart from making a handful of investments in RCH's name, Richard left RCH completely inactive. In fact, RCH never had any employees, never signed any contracts, and never was involved in any painting (or any other kind of) work.

In or around 2006, Richard became involved with a company doing business as Wallternatives. Wallternatives was a union-based paint shop specializing in projects on the Strip. Although Richard did not know it at the time, and would not find out until some time later, Wallternatives was a dba of J.L. Wallco, Inc. J.L. Wallco, Inc. is a corporation that was owned and operated by Joseph R. Esquivel ("Esquivel"). (J.L. Wallco, Inc. and Wallternatives will hereinafter be interchangeably referred to as "Wallternatives" unless context implies a distinction.) It was not until 2008 that Richard was a full-time participant at Wallternatives. Richard's role with Wallternatives was principally that of an investor, although he also drew up estimates that would be submitted when Wallternatives was invited to bid on a new project.

1  Richard became the secretary and treasurer of Wallternatives on or around March 19, 2009.
2  Richard was supposed to become a 50-percent partner, but those promises made by Esquivel
3  never materialized because Esquivel was caught embezzling the money Richard had invested,
4  after which Esquivel took all of Wallternative's property out of the office (equipment,
5  inventory, office supplies, etc.), declared personal bankruptcy, and abandoned Wallternatives
6  and its office space.

7  Claudia Bammer began working at Wallternatives in 2006. Bammer was an art director
8  at Wallternatives. As an art director, Bammer supervised the application of special finishes, like
9  venetian plaster, marbelizing, and gold leafing.

10 Richard Rejan Nieto ("Rick"), Richard's son, is also an experienced painter. In
11 September 2008 Rick acquired his painting license, and in October 2009 he incorporated
12 Genuine Quality Coatings, Inc. ("GQC"). Rick is the President of GQC. Rick invited Bammer
13 to be GQC's secretary and treasurer, and invited Richard to be a director. GQC has since been
14 engaged doing painting jobs mostly for HOAs, including apartment complexes and
15 condominiums. GQC has also worked on some commercial projects. Bammer's role with GQC
16 has primarily been office related. Bammer does GQC's bookkeeping, paperwork, invoicing,
17 and the like (she has served as art director on one project). Richard's role with GQC is limited
18 to that of an estimator.

19 Rick's purpose in creating GQC was to put his painting talents and knowledge to use to
20 make money. It had nothing to do with whether his father's partner, Esquivel, was or was not
21 paying his union dues. GQC is an entity completely separate from Wallternatives and has never
22 done business with, shared projects or employees with, or is otherwise derived from,
23 Wallternatives.

## LAW AND ANALYSIS

### I.      Summary Judgment Standard

26 Federal Rule of Civil Procedure 56(c) provides: "The judgment sought shall be rendered
27 if the pleadings, the discovery and disclosure materials on file on file, and any affidavits show
28 that there is no genuine issue as to any material fact and that the movant is entitled to a

1   judgment as a matter of law."

2   FRCP Rule 56(e) provides: "When a motion for summary judgment is properly made
3   and supported, an opposing party may not rely merely on allegations or denials in its own
4   pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial. If
5   the opposing party does not so respond, summary judgment should, if appropriate, be entered
6   against that party."

7   The United States Supreme Court ruled that "there is no issue for trial unless there is
8   sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . .
9   If the evidence is merely colorable, or is not significantly probative, summary judgment may be
10  granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 106 S. Ct. 2505, 2511 (1986)
11  (citations omitted). After a motion for summary judgment has been made, the adverse "*must* set
12  forth *specific facts* showing that there is a genuine issue for trial." Id. (emphasis added). If no
13  genuine issue of fact exists, or is shown to exist, it is the duty of the court to grant summary
14  judgment. Id.

**II.     LR 56-1 Statement**

1.  Esquivel was the owner and president of J.L. Wallco.
2.  Beginning in March 2009, Richard was the secretary and treasurer of J.L. Wallco.
3.  J.L. Wallco was incorporated in October 2003.
4.  J.L. Wallco was a union shop.
5.  Rick is the owner and president of GQC.
6.  Claudia is the secretary and treasurer of GQC.
7.  Richard is a director of GQC.
8.  GQC was incorporated in October 2009.
9.  GQC is a non-union shop.
10. Richard is the owner and sole managing member of RCH.
11. RCH was incorporated in 2005.

12. Wallternatives and GQC never had any employees in common.[1]

13. RCH was never licensed and never had *any* employees.

14. RCH never had any relationship with a union.

15. Bammer worked as an art director of Wallternatives.

16. Bammer's work at GQC is principally administrative.

17. Esquivel managed payroll for Wallternatives.

18. Rick and Bammer manage payroll for GQC.

19. Esquivel was exclusively in charge of the direction of Wallternative employees.

20. Rick and his foreman, Chalis Garcia, direct the employees of GQC.

21. Wallternatives, GQC, and RCH never shared accounting functions.

22. Wallternatives, GQC, and RCH never shared clerical staff.

23. Wallternatives, GQC, and RCH never shared supply yards.

24. Wallternatives, GQC, and RCH never shared raw materials.

25. Wallternatives, GQC, and RCH never had customers in common.

26. Wallternatives, GQC, and RCH never shared equipment.

27. Wallternatives, GQC, and RCH never sold equipment to each other.

28. Wallternatives, GQC, and RCH never shared any accounts.

29. Wallternatives, GQC, and RCH never assumed any debts of one another.

30. Wallternatives, GQC, and RCH never shared employees.

31. Wallternatives, GQC, and RCH never paid one another's taxes.

32. Wallternatives, GQC, and RCH did not share tax identification numbers.

33. Wallternatives, GQC, and RCH never shared a fax or phone line or fax or phone number.

34. Wallternatives, GQC, and RCH never made decisions regarding employees of each other.

35. Wallternatives did mostly commercial construction on union projects,

---

[1] Although Bammer worked with both companies, she was an employee only of Wallternatives.

Page 5 of 14

particularly on the strip.

36. GQC does mostly residential projects, and has never done a union project.

37. When Esquivel learned that Rick was starting his own company, Esquivel suggested GQC be invited to share office space with Wallternatives so they could split the cost.

38. The lease for the office space was entered into by Wallternatives.

39. In November 2009 Esquivel emptied the office space of all of Wallternatives belongings, including wall-covering machines, books, filing cabinets, files, and sundry painting equipment.

40. Esquivel never returned, and no Wallternatives assets were ever transferred to GQC.

41. GQC shared office space with Wallternatives for about two months before Wallternatives was abandoned.

42. When Wallternatives stopped paying its half of the rent, GQC then began paying the full amount so it could continue using the office space.

43. Esquivel made the decision that Wallternatives would be associated with the Union.

44. Rick made the decision that GQC would not be associated with the Union.

**III.  Wallternatives Was Not an Alter Ego of Either Genuine Quality Coatings or Sunrise Painting/RCH**

For the Union to prevail on its alter-ego theory, it must "make the threshold showing that the [three] firms were a single employer, but also to prove that [GQC and RCH were] being used 'in a sham effort to avoid collective bargaining obligations,' rather than for the pursuit of legitimate business objectives untainted by 'union animus.'" UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1470 (9th Cir. 1994).

The threshold the Union must meet to prove that Wallternatives, GQC, and RCH were a single employer is determined by weighing four factors: (1) common ownership, (2) common management, (3) interrelation of operations, and (4) centralized control of labor relations. See

NLRB v. Don Burgess Constr. Corp., 596 F.2d 378, 384 (9th Cir.), cert. denied, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). Although no one factor is controlling, the most important one is centralized control of labor relations. Nor-Cal, 48 F.3d at 1470. In conducting this inquiry, courts essentially are asking whether "the alleged second business entity [is] under the actual or constructive control of the first company." A. Dariano & Sons, Inc. v. Dist. Council of Painters No. 33, 869 F.2d 514, 519 (9th Cir. 1989). Additionally, "[i]n all alter ego determinations an element of fraud or misrepresentation also exists." Id.

Weighing these factors it becomes clear that Wallternatives, GQC, and RCH were separate entities formed for separate and legitimate purposes and devoid of any fraudulent motives. Moreover, neither GQC nor RCH were or are under the actual or constructive control of Wallternatives.

### 1.    **Lack of Common Ownership**

In every alter-ego case, a threshold determination must be made as to "whether both companies are substantially owned and controlled by identical parties." Haley & Haley, Inc. v. NLRB, 880 F.2d 1147, 1150 (9th Cir. 1989).

Wallternatives, GQC, and RCH did not have common ownership. Wallternatives was owned by Joseph R. Esquivel. (See J.L. Wallco, Inc. Secretary of State Business Entity Information, attached hereto as Exhibit 4.) Esquivel incorporated Wallternatives in October 2003. (See id.) It wasn't until a few years later that Richard even became involved, after which time he was made an officer of Wallternatives. (See Ex. 1; Ex. 4; Ex. 8.) Although Richard did aspire to become a 50% partner and owner of Wallternatives, this goal was never realized because Richard caught Esquivel embezzling from Wallternatives, which spelled the beginning of the end for the company. (See Ex. 1.) Accordingly, Richard was never even a part owner of Wallternatives. (See id.)

RCH was incorporated in January 2005 and was owned solely by Richard. (See Ex. 1; Ex. 7.) RCH never had any other owner or part owner. (See id.)

GQC was formed as a sole proprietorship concurrent with a license being assigned to it and Rick in September 2008. (See Ex. 6; Ex. 2.) GQC became a corporation in October 2009.

1  Rick was and is the president and owner of GQC. (See Ex. 5; Ex. 2.) Claudia is the secretary
2  and treasurer, and Richard is a director. (See Ex. 5; Ex. 2.)

3  Wallternatives, RCH, and GQC not only were not "substantially owned by identical
4  parties," but did not have common ownership at all: Esquivel was the sole owner of
5  Wallternatives; Richard is the sole owner of RCH; and Rick is the sole owner of GQC.

### 2. Lack of Common Management

7  Although Richard was a managing member of each of the entities in question, and
8  Bammer worked for both Wallternatives and GQC, the individuals making management
9  decisions for each of the companies were entirely distinct.

10  Wallternatives was managed by Esquivel. (See Ex. 1.) Esquivel did the payroll, directed
11  the employees, and made the business decisions. (See id.) Richard's role was limited to that of
12  an estimator. (See id.) Richard was not involved in any important business-related decisions
13  until he discovered Esquivel was stealing the money Richard had invested into the company, at
14  which point he opened a separate bank account to which Esquivel was not a signatory. (See id.)
15  Esquivel left shortly afterwards. (See id.) Even then, Richard's role was limited to making sure
16  the projects still ongoing were completed before Wallternatives ceased operations. (See id.)

17  Richard had plans to begin his own painting company, but never got his license, and
18  remained busy with other pursuits, so his plans for RCH never materialized. (See Ex. 1.) RCH
19  never bid any projects, never entered into any contracts, never hired any employees, and never
20  did any business. (See id.) Although Richard made some small investments in RCH's name,
21  that was the extent of RCH's activity. (See id.) Accordingly, although Richard was the only
22  individual authorized to make management decisions for RCH, because RCH never opened its
23  doors for business, RCH was never "managed."

24  GQC is managed principally by Rick as its president and owner. (See Ex. 2.) Although
25  Rick has the ultimate authority to make decisions, he and Bammer share the responsibility of
26  doing payroll. (See id.; Ex. 3.) Rick also delegates some in-the-field management responsibility
27  to his foreman, Chalis García. (See Ex. 2.) Neither Rick nor García ever worked for
28  Wallternatives or RCH, and Bammer never had any management authority for either other

entity. (See id.; Ex. 3.)

Accordingly, there was no overlap in management among the three entities: Esquivel, and to a limited extent, Richard, had management authority for Wallternatives; RCH never progressed to the point where it would need management; and GQC is managed principally by Rick, but also in a limited capacity by Bammer and García.

### 3. Lack of Interrelation of Operations

Factors to be considered in making a determination as to whether there existed a close interrelation of operations between the union and non-union companies includes, without limitation, "shared use of office space, supplies and equipment, similar client base and operations, as well as any joint undertakings or financial relationships." Haley & Haley, Inc. v. NLRB, 880 F.2d 1147, 1150 (9th Cir. 1989) Other relevant inquiries include supplies purchased from the same suppliers, equipment or employees passed from one company to the other, one company finishing the other company's unfinished projects, and representation by the same attorney. See J.M. Tanaka Constr., Inc. v. NLRB, 675 F.2d 1029, 1034 (9th Cir.1982)).

In this case, although Wallternatives shared office space with GQC for about two months, none of the other indicia of interrelated operations are present:

Both Esquivel and Richard owned equipment that was used by Wallternatives and its employees. (See Ex. 1.) This equipment included scaffolding, paint sprayers, ladders, ropes, wall covering machines, etc. (See id..) Esquivel came and took his equipment in November 2009. (See id..) Richard kept his equipment in a storage facility, where it is still being stored today. (See id..) At no time did GQC ever use any of this equipment. (See id.; Ex. 2.)

Wallternatives and GQC did not share a phone or a fax; each company had its own phone and fax number. (See Ex. 1; Ex. 2; Ex. 3.)

Wallternatives and GQC each had their own client bases–never have the two companies had any overlap in clientele. (See Ex. 1; Ex. 2; Ex. 3.)

Wallternatives and GQC have never had any joint undertakings or financial relationships–they have never done a project together, never shared a bank account, and neither has been authorized by the other to act in its behalf. (See Ex. 1; Ex. 2; Ex. 3.)

Upon information and belief, Wallternatives and GQC never used any of the same suppliers; to the extent that the same suppliers may have been used, it was a result of coincidence and the fairly low number of paint suppliers. (See Ex. 1; Ex. 2; Ex. 3.) Never did GQC represent to any suppliers that it had a relationship with Wallternatives or attempt to use any discounts or privileges Wallternatives may have had. (See Ex. 2; Ex. 3.)

Apart from Bammer first being employed with Wallternatives and later helping start GQC, and Richard being an officer of both companies, GQC did not hire any of Wallternatives' painters, supervisors, or other employees. (See Ex. 1; Ex. 2; Ex. 3.)

Additionally, Wallternatives has never had an attorney in common with GQC. (See Ex. 1; Ex. 2; Ex. 3.) The registered agent for Wallternatives is Joseph Esquivel, Jr. (see Ex. 4); the registered agent for GQC is Incorp Services, Inc. (see Ex. 5); and the registered agent for RCH is Registered Agent, Inc. (see Ex. 7).

Wallternatives and GQC also target different markets. Wallternatives dealt primarily with big jobs on the strip, which were all union jobs. (See Ex. 1.) GQC, on the other hand, does most of its work for home-owners' associations painting apartment and condominium complexes, none of which have ever been union jobs. (See Ex. 2; Ex. 3.)

Finally, Wallternatives and GQC have separate tax identification numbers, filed separate taxes, and kept separate personnel records. (See Ex. 1; Ex. 2; Ex. 3.) And given that RCH never even opened its doors, it had no operations to consider.

Due to the complete absence of a relationship between the operations of Wallternatives and GQC, there is no doubt that this factor weighs wholly in Defendants' favor.

**4.   Lack of Centralized Control of Labor Relations**

Of the four enumerated factors considered in the alter-ego analysis, determining whether there is centralized control of labor relations between the subject companies is the most important. UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1470 (9th Cir. 1994).

"Two companies have centralized control of labor relations when one company is

involved in decisions concerning the terms and conditions of employment of workers of another company." Lopez v. Goldcorp USA Inc., No. 3:09-CV-00104-LRH-VPC, 2010 WL 3257889, at *3 (D. Nev. Aug. 13, 2010). This specifically includes "hiring and firing of employees; employee discipline; employee performance evaluations; awards, promotions and demotions; scheduling, work assignments and training; approval of vacations, sick leave and other time off; and compensation, including pay raises." Alberter v. McDonald's Corp., 70 F. Supp.2d 1138, 1144 (D. Nev. 1999.) Also relevant in the inquiry is whether each company is paying its own employee wages and benefits. Lopez, 2010 WL 3257889 at *4.

None of these factors are present here. As stated before RCH did not have any employees. GQC never used any of Wallternatives' employees, nor did it ever have any involvement with the hiring, firing, discipline, evaluations, awards, promotions, demotions, scheduling (including vacations, sick leave, and other time off), training, compensation, or pay raises. (See Ex. 1; Ex. 2; Ex. 3.) Neither did Wallternatives have anything to do with GQC's employees in any of those functions, or in any other. (See Ex. 1; Ex. 2; Ex. 3.)

Two Ninth Circuit cases highlight how ludicrous it is that the Union ever even brought a case against Defendants. In the first, Haley, the Ninth Circuit found facts sufficient to support a conclusion that the union and non-union companies were alter egos of each other. In the second, Brick Masons, despite a number of alter-ego indicators, the Ninth Circuit determined that the two companies were not alter egos.

In Haley, the ownership of the union and non-union companies were identical–the same two family members owned 467/480 (97%) of the outstanding shares, with twelve of the remaining thirteen shares being owned by other members of the same family, leaving one share out of 480 (0.2%) not belonging to the family. Haley & Haley, Inc. v. NLRB, 880 F.2d 1147, 1150 (9th Cir. 1989).

The management of the two companies was also the same. The two companies had the same president, the same accountant, and the vice president of one was the secretary-treasurer of the other. Id. Moreover, each of these officers also had significant involvement in the day-to-day operations of both companies. Id. The vice-president/secretary-treasurer, for instance,

1 besides playing a dominant managerial role in both companies, made the decision to purchase
2 the non-union business, terminate the union business, transfer title of equipment from the union
3 company to the non-union company, and dispatch union drivers from the union company to
4 haul loads for the non-union company. Id.

5       In analyzing the interrelatedness of operations between the two companies, the Ninth
6 Circuit determined the union and non-union companies used the same equipment, had the same
7 business purpose, used the same operations and procedures, and had the same customers. Id. at
8 1151. The two companies also shared an "intercompany" account so one could pay off the debts
9 of the other. Id.

10       The Court also found that there was centralized control over labor relations for both the
11 union and non-union companies in Haley. It came to this conclusion after discovering that the
12 non-union's president and its secretary-treasurer played significant roles in the union
13 company's relationship with the union. Id. Specifically, they were involved in attempting to
14 renegotiate the union company's union contract, and they recruited the union company's drivers
15 to work for their non-union company with the condition that the union drivers withdraw from
16 the union, which eleven of the drivers eventually did. Id.

17       The Ninth Circuit, after considering all of these facts, concluded that the non-union
18 company "was activated for the purpose of eliminating the high costs of dealing with the
19 [u]nion" and was an alter-ego of the union company. Id. at 1151-52. See also Gateway
20 Structures, Inc. v. Carpenters 46 N. Cal. Counties Conf. Bd. of United Bhd. of Carpenters &
21 Joiners of Am., AFL-CIO, 779 F.2d 485, 487 (9th Cir. 1985).

22       In Brick Masons, both the union and non-union companies were owned by the same
23 holding company, had common officers and directors, often held their board meetings together,
24 commonly managed their payroll systems, financed their accounts receivable on the same loan,
25 were located at the same address, shared certain accounting functions, shared clerical staff,
26 shared a supply yard, shared raw materials, had employees regularly switch back and forth
27 between them, and had the same person direct employees of both companies to job
28 assignments. Brick Masons Pension Trust v. Indus. Fence & Supply, Inc., 839 F.2d 1333, 1336

(9th Cir. 1988).

However, despite the obvious connection between the union and non-union companies, the district court refused to find that they were alter egos. Id. at 1336–37. The two were not alter egos of each other because of three opposing factors: (1) the non-union company was formed before the union company; (2) one company built major block walls in new housing tracts while the other built smaller block walls and chainlink fences at individual private residences, and (3) the number of union employees increased over the relevant period. Id. The Ninth Circuit Court affirmed the district court's decision. Id.

The instant case is patently distinguishable from Haley. **None** of the numerous factors in Haley that supported the existence of alter-ego companies is present in the instant case. Furthermore, the relationship between Wallternatives, GQC, and RCH (if it can even be termed a "relationship") is far more attenuated than the relationship analyzed in Brick Masons, and even in Brick Masons no alter ego was found. Beyond the fact that Richard and Bammer each played a role in both a union and non-union company; and the fact that GQC and Wallternatives, which are both painting companies, briefly shared office space, **there is no evidence whatsoever** to suggest that Wallternatives and its principals had any sort of intent to defraud the Union of its dues by forming GQC or RCH as sham continuations of Wallternatives.

## CONCLUSION

Based on the foregoing, and the fact that the Union brought this case without any grounds, Defendants respectfully request that this Court grant their Motion for Summary Judgment.

DATED: this 6th day of October 2010.         WOODBURY, MORRIS & BROWN

                                                 */s/ Zachariah B. Parry*
Steven L. Morris, Esq.
Nevada Bar No. 7454
Zachariah B. Parry, Esq.
Nevada Bar No. 11677
701 N. Green Valley Parkway, Suite 110
Henderson, Nevada 89074
*Attorneys for Defendants*

WOODBURY, MORRIS & BROWN
701 N. Green Valley Parkway, Suite 110
Henderson, Nevada 89074
(702) 933-0777 ♦ Fax (702) 933-0778

**CERTIFICATE OF MAILING**

I hereby certify that on the 6th day of October 2010, I caused to be served a true and correct copy of the **MOTION FOR SUMMARY JUDGMENT** by filing the same with the CM/ECF electronic filing system of the United States District Court for the District of Nevada, which is automatically sent to the following individuals:

Evan L. James, Esq.
CHRISTENSEN JAMES & MARTIN
7440 West Sahara Avenue
Las Vegas, Nevada 89117
702.255.1718
*Attorneys for the Union*

                                 */s/ Zachariah B. Parry*
                                 An Attorney at Woodbury, Morris & Brown

**WOODBURY, MORRIS & BROWN**
701 N. Green Valley Parkway, Suite 110
Henderson, Nevada 89074
(702) 933-0777 ♦ Fax (702) 933-0778