1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CHRISTENSEN JAMES & MARTIN**
KEVIN B. CHRISTENSEN, ESQ.
Nevada Bar No. 00175
EVAN L. JAMES, ESQ.
Nevada Bar No. 007760
LAURA J. WOLFF, ESQ.
Nevada Bar No. 006869
7440 W. Sahara Ave.
Las Vegas, NV 89117
(702) 255-1718
Attorneys for Plaintiffs

**CHRISTENSEN JAMES & MARTIN**
7440 W. SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

Painters Joint Committee, through its designated
fiduciaries, John Smirk and Thomas Pfundstein;
IUPAT Industry Pension Fund; Employee Painters
Trust Health & Welfare Fund; Painters Vacation-
Holiday Savings Fund; Painters Apprentice
Training Trust Fund; Painters Industry Promotion
Fund; Painters JCIP Fund; Painters Organizing
Fund; and Painters Labor Management Contract
Fund,

                    Plaintiffs,

v.

J.L. Wallco, Inc. dba Wallternatives, a Nevada
corporation; Genuine Quality Coatings, Inc., a
Nevada Corporation; Sunrise Painting/RCH, Inc., a
Nevada Corporation; Richard Rejan Nieto,
individually and dba Genuine Quality Coatings,
Inc.; Claudia Bammer aka Claudia Nieto, an
individual; Richard Raoul (aka Rqoul) Nieto, an
individual; Great American Insurance Company;
John Does I-XX, inclusive; and  Roe Entities I-XX,
inclusive,

                    Defendants.

Case No. 10-cv-1385-JCM-PAL

OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT FILED BY
GENUINE QUALITY COATINGS,
INC.; SUNRISE PAINTING/RCH,
INC.; RICHARD REJAN NIETO;
CLAUDIA BAMMER; AND
RICHARD RAOUL NIETO

and the joinder filed by

GREAT AMERICAN INSURANCE
COMPANY

and

COUNTER MOTIONS FOR
DISCOVERY AND AN ORDER
AUTHORIZING DISCLOSURE OF
LABOR AND WAGE
INFORMATION

     COME NOW, the Plaintiffs, Painters Joint Committee, through its fiduciaries, John

Smirk and Thomas Pfundstein; IUPAT Industry Pension Fund; Employee Painters Trust Health

& Welfare Fund; Painters Vacation-Holiday Savings Fund; Painters Apprentice Training Trust

Fund; Painters Industry Promotion Fund; Painters JCIP Fund; Painters Organizing Fund and

Painters Labor Management Contract Fund (collectively "Plaintiffs" or "Trust Funds") by and

through their attorneys, Christensen James & Martin, and hereby oppose the Motion for

1   Summary Judgment and Joinder thereto filed by Genuine Quality Coatings, Inc.; Sunrise

2   Painting/RCH, Inc.; Richard Rejan Nieto; Claudia Bammer; Richard Raoul Nieto; and Great

3   American Insurance Company and file their Counter Motions to allow for discovery pursuant to

4   FRCP 56(f) and for an Order authorizing disclosure of wage information from the State of

5   Nevada.

6       DATED this 27th day of October, 2010.

7                                       CHRISTENSEN, JAMES & MARTIN

8       By:  */s/ Evan L. James*
                                        KEVIN B. CHRISTENSEN, ESQ.
9                                       Nevada Bar No. 00175
                                        EVAN L. JAMES, ESQ.
10                                      Nevada Bar No. 007760
                                        LAURA J. WOLFF, ESQ.
11                                      Nevada Bar No. 006869
                                        7440 W. Sahara Ave.
12                                      Las Vegas, NV 89117
                                        (702) 255-1718
13                                      Attorneys for Plaintiffs

14                          MEMORANDUM OF POINTS AND AUTHORITIES

15  **I.    PRELIMINARY STATEMENT AND LAW**

16      "The purpose of invoking the summary judgment procedure is to 'smoke out' those facts

17  [outside the record]." *Business Equipment Center, Ltd. v. DeJur-Amsco, Corp.,* 465 F.Supp. 775

18  783 (D.C. Cir. 1979).  Since the Defendants have yet to file an answer, the only record is the

19  Complaint and the Defendants' Motion with supporting Affidavits.  Apparently, the Defendants

20  were so unimpressed with the Plaintiffs "ridiculous lawsuit", (Affidavit of Richard Raul Nieto 4

21  ¶ 45, herein after "Nieto Sr. Aff"), that they decided to "smoke out" some early facts by asserting

22  unsupported *ipse dixit* statements before this Court.

23      The Latin term *ipse dixit* means someone asserts something is true simply because "[h]e

24  himself said it;" i.e., it is true because I said it is true. BLACK'S LAW DICTIONARY (6th ed.

25  1990) at 828.  The Defendants' Motion and supporting Affidavits are primarily based upon *ipse*

26  *dixit* statements.

27      For example, Defendants' Motion states, "Esquivel was exclusively in charge of the

28  direction of Wallternative employees."  (Motion at 5:8.)  This statement is expressly contrary to a

CHRISTENSEN JAMES & MARTIN
7440 W. SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

-2-

1   written agreement between Joseph Esquivel ("Joseph" or "Esquivel") and Richard Roul Nieto

2   ("Nieto Sr.") that states Nieto Sr. "**will manage** the painting operations of the company . . . and

3   Claudia Nieto [aka Claudia Bammer] will manage the faux finish jobs." (*See* Ex. 1-A ¶ 5,

4   attached to Joe Esquivel Affidavit, hereafter "Esq. Aff.")(emphasis added)

5     While FRCP 56(b) allows the Defendants to bring their Motion, it also allows parties

6   time to conduct discovery pursuant to subpart (f). In the present situation, the Defendants claim

7   not to be alter egos of one another, but there is ample documentary and testimonial evidence

8   showing that the Defendants are indeed alter egos. Caution dictates that discovery should be had,

9   because the Trust Funds need to obtain information necessary to calculate damages. Therefore,

10   the Court is moved to allow for discovery and the likely filing of a counter motion for summary

11   judgment through a supplemental pleading.

12   **II. FACTS**

13     J.L. Wallco, Inc. dba Wallternatives ("Wallternatives" or "Wallco") was formed on

14   October 16, 2003. Wallternatives did painting and wallcovering work in Clark County, Nevada

15   and the surrounding areas. (Esq. Aff.¶ 1.) Initially, Esquivel was the only officer and director of

16   the corporation and was a non-union employer for almost three years. (Id. ¶ 4 .) In 2005, Nieto

17   Sr. began working as an estimator for Wallternatives. He also worked as an estimator for several

18   other companies. (Id. ¶ 5.) On June 15, 2005, Esquivel and Nieto Sr. executed a Management

19   Contract whereby Nieto Sr. became a 50% owner and operator of Wallternatives. (Id. ¶ 6, *see*

20   *also* Ex.1-A ¶1.)

21     The Management Contract vests certain management responsibilities in Nieto Sr. and his

22   wife Bammer. The document states that, "Nieto wishes to become **co-owner and operator**. . . ."

23   (Id. ¶ 2) and that "[i]t is intended that **Nieto [Sr.] will manage** the painting operations of the

24   company . . . and Claudia Nieto **will manage** the faux finish jobs. (Id. ¶ 5)(emphasis added.) The

25   Management Contract also states that "Esquivel has already been approved by the State

26   Contractors Board and the appropriate unions to act as a union contractor in the State of

27   Nevada." (Id.) However, the Management Agreement does not state that Wallternatives was

28   actually a union signatory at that time.

1    Wallternatives became a union signatory at the insistence of Nieto Sr. who wanted to bid

2    work on the Las Vegas Strip.  (Id. ¶ 10.)   Wallternatives did not become a union signatory until

3    July 11, 2006, more than a year after the Management Agreement had been executed.  Nieto Sr.

4    wanted to be a union signatory, but Esquivel executed the Shop Card, because Nieto Sr. refused

5    to execute any union documents. (Id. ¶ 11; *see also* Ex. 1-B)

6    During 2008 and 2009, business was slow for Wallternatives as well as the entire painting

7    and taping industry.  Nieto Sr.'s personality and Esquivel's reliance on his representations

8    allowed Nieto Sr. to slowly squeeze Esquivel out of Wallternatives' management decisions.

9    Nieto Sr. took over Wallternatives and became the person in charge.  (Id. at ¶ 13.)

10    Wallternatives failed to pay contributions to the Trust Funds for covered work as required

11    by the Collective Bargaining Agreement. (Esq. Aff. ¶ 15.)  On August 14, 2007, the Trust Funds

12    initiated litigation in this Court as Case No. CV-S-07-01079-PMP-PAL to recover contributions

13    and other damages.  On March 28, 2008, Esquivel executed an Amended Stipulation for Entry of

14    Judgment by Confession on behalf of Wallternatives [Docket No. 14].  On that same date, Nieto

15    Sr. was added as a Defendant and served with the Summons and Complaint.  Thereafter, multiple

16    orders, including this Court's Permanent Injunction, were entered in favor of the Trust Funds and

17    against Wallternatives.  The Trust Funds proceeded  with collection activities against

18    Wallternatives through July 20, 2010. (*See* Ex. 2 ¶ 13, herein after "James Aff.")

19    On or about January 31, 2010, Wallternatives allowed its Contractor's License to expire.

20    (Esq. Aff. ¶ 17.)  In October 2009, Nieto Sr., Nieto Jr. and Bammer incorporated Genuine

21    Quality Coatings ("GQC"). (*See* Mot. Ex. 2, Affidavit of Richard Rejan Nieto ¶¶ 3-4, hereafter

22    "Nieto Jr. Aff.") Nieto Sr. is the father of Nieto Jr. and the husband of Bammer, making her

23    Nieto Jr.'s stepmother.  Nieto Jr. was only about 22 years old when GQC was incorporated.

24    (Esq. Aff. ¶ 18.)

25    On November 20, 2009, Wallternatives entered into a contract with APCO Construction

26    ("APCO") for work on the Las Vegas Museum ("Museum Project").  (*See* Affidavit of Joe Pelan

27    Ex. 3 ¶ 3, hereinafter "Pelan Aff.")   The Museum Project was a Public Works Project which

28    required prevailing wages, the submittal of Certified Payrolls and the use of Union

subcontractors.  (Id. ¶4.)  Nieto, Sr. executed the subcontract on behalf of Wallternatives and represented himself as being one of the owners of Wallternatives with the authority to do business and execute contracts on the company's behalf.  (Id. ¶¶ 5-6.)

The Nieto's formed GQC to try and avoid their obligations with the Union.  (Esq. Aff. ¶ 20.)  On February 18, 2010, Nieto Sr. sent an email to APCO seeking to transfer Wallternatives' contract to GQC.  (Affidavit of Brian D. Benson Ex.¶¶ 3-4, herein after "Benson Aff.").  Nieto Sr. stated in the email:

> **we have formed a new company Genuine Quality Coatings, I am one of the partners and owner . . . we wanted to end our relationship with the union since Wallternatives is signatory . . . we would prefer to take over the contract from Wallternatives since it is the same owners, and not have to deal with the union, thanks, Richard.**

(Benson Aff. ¶ 4; *see also* Ex. A-4.)  Nieto Sr. expressly claimed to be GQC's "**partner and owner**" and that Wallternatives and GQC has "**the same owners.**"  He further asserted that GQC was expressly created so that Wallternatives' owners would "**not have to deal with the union.**" (Id.)(emphasis added.) This statement made by Nieto, Sr. is substantial evidence that should on its own preclude summary judgment for the Defendants.

On December 28, 2009, Nieto, Sr. executed a contract on behalf of Wallternatives with Western States Contracting for $38,000.00.  (James Aff. Ex. 2-D.) The contract, like the APCO contract, was for a public works project in which promises were made and accepted regarding labor on behalf of Wallternatives.

GQC and Wallternatives' work was the same, requiring the same type of contractors license.  (Esq. Aff.¶ 21.)  Two of GQC's contractors license classifications are for C-4A-Painting and C-4B-Wallcovering.  (Id.; *see also* Ex. 1-C.)  Wallternatives contractors license was likewise for C-4A Painting and C-4B Wallcovering. (Id.; *see also* Ex. 1-D.)  Sunrise Painting/RCH, Inc. ("Sunrise") also was performing work that required a C-4 Painting license. (James Aff. Ex. 2-A at 15-17.)  In a subcontractor/supplier profile document, GQC listed its services as "painting, wallcovering . . . ." (Esq. Aff. Ex. 1-E.)  Wallternatives and GQC had the same monetary licenses limit, the same bonding company and the same bonding agent.  (Id. ¶¶ 25-26; *see also* Ex. 1-C

1    and 1-D.)  GQC, like Wallternatives, has bid and performed public works projects. (Id. ¶ 27.)

2         In 2005, Nieto Sr. was criminally convicted for illegally using Sunrise Painting/RCH,

3    Inc.'s contractor's license to bid and perform contracts requiring a C-4 Painting license. (James

4    Aff. Exs. 2-A, 2-B and 2-C.)  Nieto Sr. has continued to operate Sunrise as a painting company.

5    (Esq. Aff. ¶21.)  He had the final say of all business and employment matters for Sunrise, GQC

6    and Wallternatives.  He reviewed all contacts, did estimates and was generally in charge of all

7    three companies.  (Esq. Aff. ¶ 28.)

8         Wallternatives, Sunrise and GQC appear to be financially intertwined in labor and

9    business.  Attached to Esquivel's Affidavit as Exhibit 1-G are six check nos. 3711-3716 dated

10   August 29, 2009 from a banking account with the name Sunrise Painting/RCH, Inc. made

11   payable to several different individuals. (Esq. Aff. ¶ 31.)  One of the Payees is Javier Reyes who

12   was a classified "Paper Hanger" for the Union at the time. (*See* Affidavit of Mike Dunham ¶ 4,

13   hereinafter "Dunham Aff.)   Furthermore, attached to Esquivel's Affidavit as Exhibit 1-H is

14   check no. 4116 dated February 2, 2010 from a banking account with the name "Sunrise

15   Painting/RCH, Inc." and made payable to Harsch Investment Properties (Wallternatives'

16   Landlord). (Esq. Aff. ¶32.)  Another example is four checks made payable to Sunrise from

17   Wallternatives and signed by Bammer in the total amount of $40,128.55.  (Esq. Aff. ¶ 33 Ex. 1-

18   I.)  Esquivel never authorized the checks to be written nor does he know the purpose of the

19   payments.  (Id.)

20        Wallternatives, Sunrise and GQC shared and jointly paid for office space and

21   warehouse/production facilities at 7340 Eastgate Road, Suite 160, Henderson, Nevada

22   ("Offices"). (Esq. Aff. ¶ 35.)  The Offices were leased to Wallternatives by Harsch Investment

23   Properties - Nevada, LLC ("Landlord").  Esquivel is listed on the Lease Agreement as

24   Wallternatives' President and Nieto Sr. is listed on the Lease Agreement as Wallternatives'

25   Director (just like he is listed with GQC).  (Esq. Aff. ¶ 34; *see also* Ex. 1-J.)  The Offices

26   consisted of four individual offices totaling 1,576 square feet and warehouse space totaling 2,823

27   square feet with a 45 foot loading dock. (*See* Ex. 1-J at 1.)  No other tenants or subtenants appear

28   on the Lease Agreement.

Rent for the joint Offices was paid by all three entities.  (Esq. Aff. ¶ 37.)  On January 1, 2010, Bammer signed a check made payable to the Landlord from Sunrise in the amount of $2,772.00. (*See* Ex. 1-K.) On November 1, 2009, Bammer signed a check made payable to the Landlord form GQC in the amount of $600.00.  (*See* Ex. 1-L.)  On July 1, 2009, Nieto Sr. signed a check made payable to the Landlord from Wallternatives in the amount of $2,172.00.  (*See* Ex. 1-O.)

Equipment, materials and supplies for Wallternatives, GQC and Sunrise was collectively stored in the Offices.  (Esq. Aff. ¶ 43.)  The materials and supplies were commingled among the companies and each company would use the other companies equipment.  (Id.)  A picture taken in 2009 shows materials marked as "RCH (of Sunrise/RCH) in the Offices. (*See* Ex. 1-P.)[1]  There are additional pictures showing materials and supplies used by Wallternatives, Sunrise and GQC. (*See* Ex. 1-Q.)

In February 2010, Esquivel was locked out of the Offices.   Thereafter, he was able to remove some of his personal equipment, but could not retrieve any of Wallternatives' equipment. (Esq. Aff ¶ 62-63.)  In fact, when he attempted to remove some of Wallternatives' equipment, Nieto Sr. objected and stated, "GQC is using the equipment and you are not taking it and there is nothing you can do about it."  (Id.)

GQC used Wallternatives supplier accounts for its own projects, including accounts with Pape′ Material Handling ("Pape′"), Dunn-Edwards Paints ("Dunn-Edwards") and Garret Materials ProBuild ("ProBuild").  (Esq. Aff. ¶ 47.)  Susan McCarver of ProBuild has testified that either Nieto Sr. or Nieto Jr. ordered materials for GQC on Wallternatives' account. (Affidavit of Susan McCarver ¶ 3, hereinafter "McCarver Aff.")  In fact, the ProBuild account for Wallternatives was paid, at least in part, by a joint check from Valley Construction Services, Inc. made payable to GQC and ProBuild.  (Id. ¶¶ 3-4; Ex. 6-A, 6-B.)

Similarly, ten of Wallternatives' invoices attached to Esquivel's Affidavit from Pape′ were for materials used by or incorporated into GQC projects.  (Esq. Aff. ¶; *see also* Ex. 1-R.)

---

[1] "RCH" is seen in white lettering on a crate in the lower left corner of the picture contained in Exhibit 1-P).

1   Also, several invoices from Dunn-Edwards list Wallternatives as the company that ordered

2   material, but on the top of each document (as found) is a sticky note stating "G.C.C. Invoice."

3   (Esq. Aff. ¶ 49; *see also* Exs. 1-S, 1-T.)  These facts show that the sharing of supplier accounts

4   was the normal procedure for operating the companies.  (Esq. Aff. ¶ 51.)

5          The Offices shared by the companies were continuously used until sometime in October

6   2010 when they were abandoned by the Nietos, almost 18 months after the lease was first signed.

7   (Esq. Aff. ¶ 64.)  On October 11 and 12, 2010, Esquivel entered the Offices to investigate the

8   premises after the abandonment.  He was accompanied by the undersigned on October 12, 2010

9   for the purposes of preserving evidence.  Documents were removed and retained by counsel

10  (some of which are attached hereto as exhibits).  Other items such as paint were left.

11  **III.    ARGUMENT**

12         A.    <u>Alter-Ego Liability is Determined by Common Ownership, Management and
13               Operations and Centralized Control of Labor Relations.</u>

14         The Defendants are correct that the Court must first determine whether Wallternatives,

15  GQC, and Sunrise are alter egos through an evaluation of 1) common ownership, 2) common

16  management, 3) interrelations of operations, and 4) centralized control of labor relations. *UA*

17  *Local 343 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. &*

18  *Canada, AFL-CIO v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1470 (9th Cir. 1994).  "No factor is

19  controlling and all need not be present" (*J.M. Tanka Const., Inc. v. N.L.R.B.,* 675 F.2d 1029,

20  1033 (9th Cir. 1982)) because the alter-ego doctrine is essentially one of equity to be determined

21  by an evaluation of case facts.  *McLauglin v. L. Bloom Sons Co.*, 206 Cal.App.2d 848, 853

22  (Cal.App. First. Dist. Div. 2, Cal. 1962). Some relevant facts to consider in the alter ego analysis

23  include "'substantially identical' management, business purpose, operations, equipment,

24  customers, and supervision, as well as ownership.'" *Haley & Haley v. N.L.R.B.*, 880 F.2d 1147,

25  1150 (9th Cir. 1989) and *Dariano & Sons, Inc. v. District Counsel of Painters No. 33,* 869 F.2d

26  514, 518 (9th Cir. 1989).

27         However, the foregoing elements and factors are general rules in which no one element or

28  fact will be dispositive because "[t]he focus of the alter ego test . . . is on the existence of a

1    disguised continuance of the same or an attempt to avoid the obligations of a collective

2    bargaining agreement through a sham transaction or a technical change in operations.'" *N.L.R.B.*

3    *v. O'Neill*, 965 F.2d 1522, 1529 (9th Cir. 1992)(quoting *Haley*, 880 F.2d 1147, 49-50 (9th Cir.

4    1989)).

5         Since the alter ego doctrine is an equitable doctrine, "[a] guiding concept is the need for

6    the court to avoid an over-rigid preoccupation with questions of structure and apply the

7    preexisting and overarching principle that liability is imposed to reach an equitable result."

8    *Litchfield Asset Mgt. Corp. v. Howell*, 799 A.2d 298, 312 (Conn. App. 2002).  This is particularly

9    true where the cause of action involves a federal question.  *See e.g.*, *SEC v. Elmas Trading Corp.*,

10   620 F.Supp. 231 (D.Nev. 1985), <u>aff'd.</u> 805 F.2d 1039 (9th Cir. 1986).  Federal analysis gives less

11   respect to the corporate form than does the strict common-law alter ego doctrine.  <u>Id</u>.  "Courts

12   have without difficulty disregarded corporate form for substance where ERISA's effectiveness

13   would otherwise be undermined."  *Lowen v. Tower Asset Management, Inc.,* 829 F2d 1209, 1220

14   (2nd Cir. 1987) (citing *Alman v. Danin*, 801 F.2d 1 (1st Cir. 1986)).  The alter ego doctrine,

15   which is remedial in nature, is not applied to eliminate the consequences of company operations,

16   but to avoid inequitable results. *Elmas Trading Corp.*, 620 F.Supp. 231.

17        B.    <u>Fraud is Not a Necessary Element in an Alter-Ego Case.</u>

18        The Defendants' argument that "fraud or misrepresentation" must also be proven as an

19   element to succeed on an alter-ego claim is not fully developed because "the determination that

20   one entity is merely another's alter ego will depend to some extent on whether or not the transfer

21   of assets or the dissolution of the old entity is motivated by union animus."  *Haley,* at 1150.

22   While discrete instances of fraud may exist, they are not necessarily required because the entire

23   process of seeking to avoid a union obligation as evidence by animus and the elements and

24   factors set forth above actually constitute the fraud in labor associated alter-ego cases.  Thus, all

25   of the traditional elements of fraud, such as intent, do not necessarily have to be present in order

26   for the Court to find alter-ego. *J.M. Tanka*, at 1033, *See also, Stardyne, Inc. v. N.L.R.B.*, 41F.3d

27   141, 141 n.4 (3rd Cir. 1994)(noting, "The Second, Fifth, Sixth, Seventh, Ninth, and District of

28   Columbia Circuits have held that intent is not essential to the imposition of alter ego liability, but

1   is a factor that the Board may take into consideration.").

2       When fraud is considered, it may be inferred from other facts.

3           Although alter ego is characterized as a finding of fact, it represents
4           the court's ultimate conclusion that contractual obligations will be
            imposed upon a non-signatory employer. Because there is generally
5           little direct evidence of an employer's motive or intent, we evaluate
            the court's findings and conclusions on the basis of inferences that
6           may be drawn from its predicate factual findings. Where evidence
7           suffices to support an inference that the non-signatory company was
            formed to avoid a labor agreement, the alter ego finding will be
8           upheld.

9   *Trustees of the Operating Engineers Pension Trust Fund v. G.C. Wallace*, 895 F.2d 154 (9th Cir.
10  1988), 1988 WL 9778 *2 (C.A. 9 (Nev.)).

11      C.      Specific and Genuine Issues of Fact Show that GQC, Sunrise and Wallternatives
12              had Common Ownership, Management, Operations and Labor Relations.

13              1.      *Sunrise is an Active Company.*

14      In his Affidavit Nieto Sr. claims that except for a few investments Sunrise is inactive so

15  commonality does not apply.  However, the evidence shows that Sunrise has been actively doing

16  business for years.  Exhibit 1-G contains six checks, nos. 3711-3716, dated August 29, 2009

17  from a banking account with the name Sunrise Painting/RCH, Inc.  The checks are made payable

18  to several different individuals for what is believed to be labor.  Furthermore, Exhibit 1-H

19  contains Sunrise check no. 4116 dated February 2, 2010 made payable to Harsch Investment

20  Properties for rent.  Perhaps most difficult for the Defendants is the fact that in 2005 and 2006

21  Sunrise was implicated with Nieto Sr. for doing business without a contractors license or for

22  improperly allowing the use of a contractors license.  (Ex. 2-A through 2-C.)  Therefore, it is

23  unequivocal that Sunrise was and has been doing business in Clark County, Nevada for several

24  years.

25      The likely reason that Nieto Sr. refutes using Sunrise is because he was criminally

26  convicted in 2005 for illegally using Sunrise Painting Company's contractors license.  Nieto Sr.

27  used or collaborated for the improper use of the company's contractors license by operating

28  under Sunrise/RCH.  Thus, Sunrise's ability to be a licensed contractor pursuant to NRS 624 et

1  seq. was tainted, making the obtaining of a contractors license unlikely due to NRS 624.260 and

2  NRS 624.265 because he had been convicted (twice) of "(a) [c]ommitt[ing] an act which would

3  be grounds for the denial, suspension or revocation of a constructor's license;" had "(b) A bad

4  reputation for honesty and integrity;" and "(c) **Entered a plea of guilty . . . in this State or any**

5  **other jurisdiction, of a crime arising out of, in connection with or related to the activities of**

6  **such person in such a manner as to demonstrate his or her unfitness to act as a contractor**. .

7  . ." NRS 624.265(1).  Indeed, another conviction of Nieto Sr. for acting without a contractor's

8  license pursuant to NRS 624.700 would result in a category E felony punishable by a minimum

9  one year prison term and a $5,000.00 to $10,000.00 fine.  NRS 624.750(2)(c).

10     2.     *Common Ownership exists because Wallternatives, GQC and Sunrise were dominated by members of the same family.*

11     Ownership interests of family members in different companies is treated as common

12  ownership for single employer or alter-ego purposes.  *J.M. Tanka Const., Inc.*, at 1034 (reading,

13  "[A]ll the J.M. Tanka owners are members of the same family, and Tanka clearly dominated both

14  corporations.").  Common ownership between alter-ego's may occur where a parent and child

15  own interest in the two differently named entities. *Bryer Construction Co.*, 240 NLRB 102, 104

16  (1979).  All of the Defendants' Affidavits are from the same family.  Nieto Sr. is the father of

17  Nieto Jr. and the husband of Bammer.  Bammer is Nieto Jr.'s stepmother.  Nieto Sr. admits to

18  being a managing member of each of the entities.   Bammer and Nieto Jr. are listed as the

19  Officers and Directors of GQC.  Nieto Sr. admits to being the owner of Sunrise and is listed as an

20  Officer and Director of Wallternatives.  Nieto Jr. was only 22 years old when he incorporated

21  GQC at about the same time that the Trust Funds won a lawsuit against Wallternatives for unpaid

22  health care and pension contributions.

23     In *J.M. Tanka*, the union threatened in August of 1978 to pull its workers off of J.M.

24  Tanka, Inc.'s jobs because the contractor owed fringe benefit contributions to its trust funds.

25  That same month, R.M. Tanka, a construction company, was incorporated with owners and

26  family members of J.M. Tanka taking primary ownership and control of the company.  The court

27  upheld an N.L.R.B. ruling finding that J.M. Tanka and R.M. Tanka were alter-ego's of one

28

another, in part, because the companies were owned by the same family. Like *J.M. Tanka*, corporate ownership of Wallternatives, GQC and Sunrise is held by the same family.

Indeed, *J.M. Tanka* and the present Case are extremely similar.  GQC, like R.M. Tanka, was incorporated when Wallternatives, like J.M. Tanka, was incurring liability for not paying employee benefit contributions to trust funds.  Both cases involve similar facts surrounding family members who sought to avoid a collective bargaining agreement in an effort to reduce labor expenses.  In his email to APCO, Nieto Sr. even admits that GQC was formed to avoid the Union.  (Benson Aff. Ex. 4-A) There is no question that common ownership exists between the three companies.

i.  *Nieto Sr. has ownership interests in Wallternatives, GQC and Sunrise*.

In *Southern California Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co.*, 558 F.3d 1028, 1032 (9th Cir. 2009), the court reiterated the rule that part of the alter-ego determination is based upon the degree of common ownership.  As such, the alter-ego determination is not necessarily based upon actual common ownership by one individual.

The Defendants have emphatically stated that Wallternatives, GQC and Sunrise have different owners.  The veracity of the Defendants' Affidavits and the accuracy of their argument directly contradicts the real time, non-litigation, claim of joint ownership.  Indeed the argument that "Esquivel was the sole owner of Wallternatives; Richard was the sole owner of RCH [Sunrise]; and Rich was the sole owner of GQC" (Mot. 8:3-5) is directly contrary to the express representations made to contractors for the purpose of obtaining jobs.  For the Defendants, joint ownership of the companies is necessary to get jobs but must be abandoned to avoid liabilities. The law does not allow such a position.

Nieto Sr.'s claim of ownership in Sunrise is well established by admissions in his Affidavit.  He is also the owner of Wallternatives as evidenced by the Management Contract. (*See* Ex. 1-A).  On February 18, 2010, he sent an email to APCO claiming to be a partner and owner of GQC and that Wallternatives and GQC are owned by the same people.  He specifically stated that

-12-

> we have formed a new company Genuine Quality Coatings, **I am one of the partners and owner** . . . we wanted to end our relationship with the union since Wallternatives is signatory . . . **we would prefer to take over the contract from Wallternatives since it is the same owners**, and not have to deal with the union, thanks, Richard.

(Benson Aff. Ex. 4-A)(emphasis added.)  According to Esquivel, Nieto Sr. had the final say on all business and employment matters for Sunrise, GQC and Wallternatives. (Esq. Aff. ¶ 28.)

The veracity of the Defendants' Affidavits and the accuracy of their argument directly contradicts the real time, non-litigation, claim of joint ownership.  Indeed, the argument that "Esquivel was the sole owner of Wallternatives; Richard was the sole owner of RCH [Sunrise]; and Rick was the sole owner of GQC" (*See* Mot. 8:3-5)[2] is directly contrary to the express representations made to contractors for the purposes of obtaining jobs.

The statement made by Nieto Sr. to APCO Construction is substantial evidence **on its own** in favor of finding that the companies are indeed alter egos of one another.

> 3.    *Common Management exists because Wallternatives, GQC and Sunrise were managed by Richard Sr., Richard Jr. and Bammer.*

Common management between entities occurs where the same or substantially the same individuals manage both entities.  For at least one court, it is "compelling evidence of alter ego status" where the "members of the same family managed both entities."  *Pugent Sound Elec. Workers Health and Welfare Trust v. Deno*, 94 Wash. App. 1053 (Wash.App. Div. 1, 1999), 1999 WL 169513 ((Wash.App. Div. 1, 1999).[3]   The N.L.R.B. and Ninth Circuit Court of Appeals have found common management where one company manager ordered supplies for another company, provided credit references for another company, and monitored operations of

---

[2] Mr. Morris, Defendants' counsel, has always acted as a gentleman in the past with the undersigned.  I am therefore lead to believe that the Defendants have not been truthful with their attorney and have not fully disclosed the full nature of their conduct.  Nevertheless, in light of the evidence, it may be necessary to retract or revise certain arguments.

[3] The *Pugent Sound* court, in applying Federal law, expressly reversed a summary judgment decision in favor of the defendants and against the trust funds because "reasonable inferences," considered in the nonmoving party's favor, existed that would allow a reasonable mind to conclude that an administrator of one company who also served as an employee of another company created a nexus, in addition with other facts, sufficient to find an alter-ego existence.

-13-

1    another company. *N.L.R.B. v. O'Neill*, 1929-30.[4]

2         Nieto Sr. was a manager of Wallternatives, GQC and Sunrise.  Even as early as 2006,

3    Nieto Sr. was making management decisions by signing letters for the company.  He had the final

4    say on project related mattes, and his involvement with GQC was necessary because at 22-23

5    years old, Nieto Jr. lacked the experience and confidence necessary to conduct a painting

6    business.

7         Nieto Sr. continued to operate Wallternatives even after he claims Wallternatives's

8    principal, Esquivel, had abandoned the company.  In Paragraphs 13 and 18 of his Affidavit, Nieto

9    Sr. asserts that "in November 2009 Esquivel emptied the office space of all Wallternatives'

10   belongings,""declared personal bankruptcy, and abandoned Wallternatives and its office space."

11   If so, then Nieto Sr. had to be Wallternatives's manager on December 28, 2009 when he executed

12   a $38,500.00 contract on behalf of a company.  In addition, Nieto Sr. had to be a Wallternatives

13   manager on February 23, 2010 and March 17, 2010 when he ordered in Wallternatives's name

14   and through Wallternatives's suppliers materials that were incorporated into GQC's Jiffy Lube

15   contracts.  In addition, Nieto Sr. actively sought to move a Wallternatives contract that could not

16   be legally performed due to lack of a contractors license to GQC (the company in which he

17   claimed ownership) because the Defendants did "**not want to have to deal with the union.**"

18   Nieto Sr.'s managerial fingerprints are all over the Defendant companies and summary judgment

19   in favor of the Defendants is improper.

20        Bammer, like Nieto Sr., testified in Paragraph 35 of her Affidavit that Esquivel

21   abandoned Wallternatives in November 2009.  In January and February 2010 she wrote

22   $40,128.55 in checks directly from Wallternatives to Sunrise.  According to her, Esquivel was

23   not around (because he did not return) so the fact that $40,128.55 found its way from

24   Wallternatives to Sunrise indicates that she at least had the managerial ability to write checks on

25

26   _____

27   [4] The court, when analyzing common management, stated in dicta, "This factor standing alone
     would not seem to constitute substantial evidence that the businesses were alter egos."

28   Nevertheless, the case facts relating to common management were clearly factored into to the
     overall determination

1   behalf of Wallternatives and perhaps accept them on behalf of Sunrise.  She likewise "does

2   GQC's bookkeeping, paperwork, invoicing and the like" and her own testimony establishes that

3   she "manage[s] payroll for GQC.  Bammer, in an apparent managerial role, also wrote checks

4   from Wallternatives, Sunrise and GQC to "Harsch Investment Properties NV LLC" to pay for the

5   lease that was in Wallternatives's name.  And in what appears to be a direct contradiction to

6   Paragraph 6 of Nieto Sr.'s Affidavit (claiming that Sunrise never had employees), she wrote at

7   least six checks valued between $52.00 and $312.00 to Javier Reyes, Daniel Guerrero, Ruben

8   Acevedo, Javier Murillo, Briana Ramos and Lorena Soto for what appears to be labor.[5]  It is also

9   admitted by the Defendants that she was an employee of both Wallternatives and GQC.  She also

10  ordered materials through Wallternatives' Accounts (*See* Ex. 1-V) and verified the correctness of

11  labor performed on jobs.  (*See* Ex. 1-U.)  There can be no question that Bammer was performing

12  managerial function for all three companies.

13          There is more than enough evidence to conclude that the companies were managed by the

14  same people.

15          4.      *Genuine and Specific Facts show that GQC, Sunrise and Wallternatives*
                    *had an Interrelations of Operations.*

16
            Like the other factors, there is no definitive rule defining interrelations of operations.  The
17
    analysis is factual and ultimately applied in conjunction with the weight of each factor.
18
    However, no definitive rule does not mean that the Court is without guidance.  One court has
19
    found "strong evidence of interrelations of operations" where two companies share (or assumed)
20
    office space, staff, production facilities, supply sources, supervisors, employees and attorneys.
21
    *See J.M. Tanaka Const., Inc.,* 675 F.2d 1029, 1035.  In the present Case, Wallternatives, GQC
22
    and Sunrise shared operational costs by paying rent for the same premises, 7340 Eastgate #106.
23

24  ────────────────

25  [5] Nieto Sr. testified in Paragraph 5 of his Affidavit that "Apart from a handful of investments in
    [Sunrise]'s name, I left [Sunrise] completely inactive."  He also testified in Paragraph 6,
26  "[Sunrise] was never involved in any painting (or any other kind) of work"   Question, if so, then
    why did Sunrise on August 29, 2009 pay $312.00 to three people, $351.00 to one person,
27  $252.00 to another person, and $52.00 to another person?  An obvious answer is that Nieto Sr.'s
    testimony is not true, but an implied explanation is that Sunrise was paying for painting labor
28  given the fact one payee, Javier Reyes, was a member of the Union.

1      The Lease Agreement did not allow for Sunrise or GQC to utilize the Offices without the
2 Landlord's "prior written consent."   Wallternatives could not "(a) assign, transfer, . . . (d) sublet
3 . . . or (f) permit the use of the Premises by any party other than the Tenant . . . ." (*See* Ex. 1-J at
4 7 ¶ 10.1.)  Written consent from the Landlord for Sunrise's and GQC's use of the Offices was
5 never obtained. (*See* Esq. Aff. ¶37.)   Therefore, as a factual and legal matter, Sunrise and GQC
6 never had any legal right to possess or use the Offices, but the did so under Wallternatives' name.

7      According to Esquivel, Nieto Sr.'s business partner, Sunrise was indeed conducting a
8 painting business out of Wallternatives' offices and facilities. (*See* Esq. Aff. ¶ 43, 45-46.)   In
9 fact, Sunrise paid $2,772.00 to the Landlord for use of the Offices that were leased in
10 Wallternatives' name. (*See* Ex. 1-K.)   The concept that a picture is worth a thousand words is
11 true.  Exhibit 1-P shows Sunrise [RCH] material in the Offices shared with Wallternatives and
12 GQC, a clear indication that Sunrise was intertwined with Wallternatives and GQC.

13      The evidence of interrelations of operations continues to mount in the fact that
14 Wallternatives, like *J.M. Tanaka Const.*, utilized Wallternatives's supply sources.  We currently
15 know that GQC used Wallternatives' ProBuild account on March 30 and April 2, 2010 (months
16 after the Defendants had testified that Esquivel abandoned Wallternatives); Wallternatives's
17 Pape' account on March 17, 2010; and Wallternatives's Dun-Edwards account on November 2, 3
18 and 4, 2009.  In fact, invoice number 2071048369 (*See* Ex. 1-V, third page) was ordered by GQC
19 admitted employee Chalis Garcia (*See* Mot. Ex. 2 ¶ 16; *see also* Esq. Aff. ¶¶ 56-57.), and GQC
20 paid off some of Wallternatives' ProBuild account. (*See* Ex. 6.)

21      Another fact showing interrelated operations is that Sunrise and GQC had no legal right
22 to use the Offices of Wallternatives.  The Lease signed by Wallternatives required the Landlord's
23 written permission for Sunrise's and GQC's use that was never obtained.  According to the
24 Defendants, GQC was operating out of the Offices and there is direct evidence in the form of a
25 check that Sunrise paid rent for the Offices.  The only legal way Sunrise and GQC could
26 therefore operate in or out of the Offices is if they were in fact Wallternatives operating under a
27 different name.  There is no question that Wallternatives, Sunrise and GQC operated as one
28 entity when convenient and beneficial.

1    Another point showing interrelated operations is the fact that Wallternatives and GQC

2    used the same bonding company, Great American Insurance Company and bonding agent,

3    Valerie A. Aber. (Esq. Aff. ¶ 26.)

4         5.    *There are ample facts showing Centralized Control of Labor Relations.*

5    Again, no bright line rule regarding labor control and relations exists.  However, some

6    courts have found that joint ownership and substantial control is enough.  *See Westphal v. Catch*

7    *Ball Prods. Corp.*, 953 F.Supp. 475, 479 (S.D.N.Y.1997).  As shown above, there is ample

8    evidence and statements evidencing common ownership and control.

9    The Wallternatives Management Contract between Esquivel and Nieto Sr. proves that

10   Nieto Sr. and Bammer had control over labor.  Paragraph 5, the management section, states that

11   "Nieto will manage the painting operations of the company" and that "Claudia Nieto [Bammer]

12   will manage the faux finish jobs."  The agreement also proves that Nieto knew of and consented

13   to union participation.  It reads, "Esquivel has already been approved by the State Contractors

14   Board and the appropriate unions to act as a union contractor in the State of Nevada."  As such,

15   Nieto Sr., had the contractual express and sole right of managing labor relations for

16   Wallternatives' painting operations.

17   Nieto Sr.'s right to control labor relations and control over labor relations is evidenced by

18   two known contracts.  First, Nieto Sr. signed a Wallternatives contract with Western States

19   Construction for "paint" work on "The Upper Las Vegas Wash Trail Phase 1" for the City of Las

20   Vegas.  Nieto Sr. promised Western States that "Wallternatives agrees to furnish all tools,

21   equipment, apparatus, facilities, **labor** and materials [for its scope of work]."  (emphasis added).

22   In addition, Nieto Sr. promised that Wallternatives would "**comply with federal, state and local**

23   **laws regarding to** [sic] **minimum wages, hiring and discrimination, including NRS 338.020**

24   **through 338.090**" when completing its work on the project.  In addition, Nieto Sr. acted on

25   behalf of Wallternatives by "insur[ing] that all their employees and lower tier subcontractors

26   employees on the work are paid in accordance with the **2009 Prevailing Wage Rates for Clark**

27   **Count, Nevada.**" (emphasis in original).

28

-17-

1   NRS 338.035 is particularly instructive as to Nieto Sr.s' role in labor relations because he

2   accepted on behalf of Wallternatives the right to discharge employee wages "by making

3   contributions to third a person pursuant to a fund, plan or program in the name of the worker."

4   The Plaintiffs are third person ERISA funds and plans established to accept contributions as

5   wages[6] for workers.  There is no question that Nieto Sr. was making and accepting direct labor

6   promises for Wallternatives.

7   Second, Nieto Sr. executed a Wallternatives contract with APCO for the City of Las

8   Vegas Mob Museum. (*See* Ex. 3-A) Like the Western States contract, Nieto Sr. promised APCO

9   that it would provide Wallternative's union labor to the project and that Wallternatives would be

10  responsible for its "labor trouble" (Id. ¶ 6.7.)  In fact, Nieto Sr. promised on behalf of

11  Wallternatives that the company would "strictly comply with all applicable federal, state and

12  local laws, rules, regulations, and ordinance," relating to labor, which includes compliance to

13  ERISA and the duty to bargain in good faith (Id. ¶ 16.1) and that Wallternatives would pay and

14  hold APCO harmless from any nonpayment of "contributions." (Id. ¶ 9.)

15  On February 18, 2010, Nieto Sr. sought to transfer the APCO contract to GQC for the

16  sole purpose of avoiding labor relations with the union.  He told Joe Pelan with APCO that "**we**

17  **have formed a new company Genuine Quality Coatings** . . . **we wanted to end our**

18  **relationship with the union since Wallternatives is signatory** . . . **we would prefer to take**

19  **over the contract from Wallternatives** . . . **and not have to deal with the union,** thanks,

20  Richard." (emphasis added).  Nieto Sr.'s own words show that he controlled labor relations for

21  QGC because he was refusing to deal with the union.  In fact, Nieto Sr.'s email shows that he

22  was making labor relation decisions for both Wallternatives and GQC by actively seeking to

23  avoid the union despite the fact that he had executed a contract that required his company to

24  comply with labor law, such as negotiating in good faith.

25  As the sole claimed owner of Sunrise, Nieto Sr. has to have had control over labor

26  relations for the company.  However, there is further evidence that Bammer signed a Sunrise

27

28

_____

[6] The Nevada Supreme Court defined contributions to the Trust Funds as wages. [citation].

check paying union member Javier Reyes $312.00.  Sunrise was therefore paying a union member for what implicitly looks like labor.  As the claimed sole owner of Sunrise, Nieto Sr. would therefore had to have managerial control over hiring and firing union members.

Finally, Esquivel has testified that it was Nieto Sr.'s idea to become a union contractor. He also testified that labor decision were primarily made by Nieto Sr.  The fact that the Defendants have produced self-serving affidavits with *ipse dixit* statements is not reason sufficient to enter summary judgment in the face of substantial unbiased documentation and testimony showing the existence of an alter-ego situation.

6.     *Shame and Technical Change is apparent.*

The mountain of evidence already amassed against the Defendants establishes that the Nieto's were operating to avoid the union.  Nieto Sr.'s email to that extent cannot be any clearer. GQC was established for the purpose of avoiding Wallternatives' signatory obligations.  There really is no question of fact when such statements come directly from a Defendant's mouth.

## IV.     MOTION FOR ESD RECORDS

The Plaintiffs now move the Court for its Order permitting them to obtain Quarterly Wage Reports from the Employment Security Division of the Department of Employment, Training and Rehabilitation for the State of Nevada ("ESD") for all of the Defendants.

Though confidentiality restrictions stated in NRS 612.265 generally preclude the ESD from providing the Quarterly Wage Reports to the Trust Funds, NRS 612.265(3)(a) provides an exception stating that "...the information obtained by the Division may be made available to: (a) Any agency of this or any other state or any federal agency charged with the administration or enforcement of laws relating to...labor..." ("Labor Exception").

Federal Law requires Employee Benefit Trust Funds, such as the Plaintiffs, to complete compliance audits of their contributing employers.  *See Central States Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 574 (1985) (noting that the failure to systematically collect amounts properly owed by a contributing employer constitutes an improper extension of credit).  29 U.S.C. §§1109 and 1132, specifically provide for civil actions such as the claims asserted by the Trust Funds in this action.  These, and related claims, have historically been recognized both by

CHRISTENSEN JAMES & MARTIN
7440 W. SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

1   this Court and the courts of the State of Nevada as claims for "labor". *See Trustees of the*

2   *Constr. Indus. and Laborers Health and Welfare Trust v. Summit Landscape Companies, Inc.*,

3   309 F.Supp.2d 1228, 1244 (D. Nev. 2004); and *see Tobler and Oliver Const. Co. v. Board of*

4   *Trustees*, 84 Nev. 438,  443, 442 P.2d 904, 907 (1968).

5          Under the Labor Exception, the ESD may lawfully disclose the Defendants' Quarterly

6   Wage Reports upon receipt of this Court's Order.  That information may then be utilized for

7   appropriate administration or enforcement of laws relating to labor, including the determination

8   of liability undertaken by the Trust Funds, which will serve to liquidate the amount of damages

9   claimed by the Trust Funds.  Upon receiving such Orders in similar circumstances in the past, the

10  ESD has provided Quarterly Wage Reports directly to counsel for the Trust Funds.

11         This particular motion is brought at this time for judicial economy.  This Court has

12  routinely granted such motions in the past.

13  **V.      CONCLUSION**

14         There are many documented facts supporting the Plaintiffs' Complaint.  Indeed, the

15  Plaintiffs have presented concrete evidence of alter ego while the Defendants primarily rely upon

16  *ipse dixit* statements that are in fact contrary to documentary evidence and the testimony of

17  disinterested third persons.   The Defendants' Motion should be denied, discovery should be

18  ordered, and the Court should enter its order allowing for the recovery of ESD records.

19         Dated this 27th day of October, 2010.

20                                         CHRISTENSEN, JAMES & MARTIN

21                                         By:   */s/ Evan L. James*
                                                KEVIN B. CHRISTENSEN, ESQ.
22                                              Nevada Bar No. 00175
                                                EVAN L. JAMES, ESQ.
23                                              Nevada Bar No. 007760
                                                LAURA J. WOLFF, ESQ.
24                                              Nevada Bar No. 006869
                                                7440 W. Sahara Ave.
25                                              Las Vegas, NV 89117
                                                (702) 255-1718
26                                              Attorneys for Plaintiffs

27

28

1

2

3

**CERTIFICATE OF SERVICE**

4
    I am an employee of Christensen James & Martin.  On the date of filing of the foregoing

papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

5
☒    ELECTRONIC SERVICE:    Pursuant to Local Rule LR 5-4 of the United States District

6
Court for the District of Nevada, the above-referenced document was electronically filed and served

7
on all parties through the Notice of Electronic Filing automatically generated by the Court.

8
☒    UNITED STATES MAIL:    By depositing a true and correct copy of the above-referenced

9
document into the United States Mail with prepaid first-class postage, addressed to the parties at

their last-known mailing address:

10
☐    OVERNIGHT COURIER:    By depositing a true and correct copy of the above-referenced

11
document for overnight delivery via a nationally-recognized courier, addressed to the parties listed

12
on the attached service list at their last-known mailing address.

13
☐    FACSIMILE:  By sending the above-referenced document via facsimile to those persons

14
listed on the attached service list at the facsimile numbers set forth thereon.

15

16
                                    **CHRISTENSEN JAMES & MARTIN**

17
                                    By:   */s/ Natalie Larson*

18

19

20

21

22

23

24

25

26

27

28