UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PAINTERS JOINT COMMITTEE, et al.,

          Plaintiffs,

v.

J.L. WALLCO, INC. Dba Wallternatives, et al.,

          Defendants.

2:10-CV-1385 JCM (PAL)

**ORDER**

Presently before the court is defendant Claudia Bammer's motion for summary judgment. (Doc. #103). Plaintiffs have filed an opposition to defendants' motion (doc. #108) as well as a counter motion for summary judgment (doc #109), to which defendants have replied (doc. #139). Subsequent to defendants' reply, plaintiffs filed an errata to their opposition (doc. #143),[1] as well as a motion seeking leave to file a supplemental exhibit (doc. #144).

After each of these briefs were filed and ripe for review, the parties stipulated to the filing of several supplements, thereby mooting plaintiffs' motion for a supplemental briefing. (Doc. #161). These supplements include plaintiffs' response to defendants' motion for summary judgment and alternative motion for partial summary judgment that plaintiffs have proven a prima facie case of alter ego allowing for full discovery (doc. #231), defendants' response to plaintiffs' counter motion for summary judgment (doc. #241), and plaintiffs' reply (doc. #248).

---

[1] Plaintiffs also filed an errata (doc. #111) prior to defendants' reply.

**James C. Mahan**
**U.S. District Judge**

The court notes at the outset, the disjointed filing procedure employed by the plaintiffs, and their chosen litigation strategy (for example, plaintiffs saw fit to name over 100 plaintiffs in this action, and then dismiss many of them one by one as plaintiffs' investigations revealed that released defendants had not committed any wrongs)[2] has resulted in a cluttered docket and unnecessary delay in this court's adjudication of the instant motions. Plaintiffs have explained that "there are literally thousand [sic] and thousands of documents in this case . . . with all of [this] information, there is bound to be small oversights in filing." (Doc. #144 at p. 2). While the court sympathizes with the difficulty in prosecuting this case, it reminds the parties that it expects the same degree of professional conduct from all the litigants that appear before this court, in cases both large and small.

## I.  Background

### A.  Procedural History

Plaintiffs have filed suit against over 100 different entities alleging, among other things, violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002 *et seq*. The defendants can be classified into two categories. First, are the seven alter ego defendants against whom the plaintiffs have alleged alter ego claims under ERISA. The alter ego defendants are the original defendants to this suit. Discovery as to them has been completed and they are the operative parties in the instant motions for summary judgment.

Each of the remaining ninety or so defendants were added to this suit when plaintiffs filed their third amended complaint on November 21, 2011. (*See* Doc. #106). These defendants all fall into the second group of originating contractor defendants. Plaintiffs assert claims of general contractor liability, pursuant to NRS § 608.150, against each of the originating contractor defendants. The court has stayed litigation as to these defendants pending a resolution of the alter ego claims now before the court. (Doc. #249).

. . .

---

[2] Plaintiffs have already been warned by the court (doc. #249 at 2, fn1) that their "scattershot approach to pleading" could potentially contravene Fed. R. Civ. P. 11, which requires that all factual representations in pleadings "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

James C. Mahan
U.S. District Judge

- 2 -

B.   *Substantive Facts*

The issues presented by the instant motions center around the relationship between the Nieto family and their business ventures: Genuine Quality Coatings, Inc. ("GQC, Inc."), Genuine Quality Coatings ("GQC"), Sunrise/RCH ("Sunrise") and J.K. Wallco, Inc., dba Wallternatives ("Wallternatives"). The central issue is whether any of the entities GQC, GQC, Inc., or Sunrise constitute alter egos for Wallternatives. Each of the four named entities are variously owned and operated by the three members of the Nieto family: Richard Raoul Nieto ("Nieto Sr."); his wife, Claudia Bammer; and, his son, Richard Rajon Nieto ("Nieto Jr.").

Nieto Sr. and Joe Esquivel ("Esquivel") knew each other as far back as 1998. Esquivel was a member of the painters' union and Nieto Sr. had never been a member of the union. In June 2005, Esquivel and Nieto Sr. agreed to share an equal ownership interest in Wallternatives. Nieto Sr. understood that Wallternatives was a union shop. Wallternatives entered into a collective bargaining agreement as a condition of becoming a union signatory which required Wallternatives' contributions to certain trust funds. Wallternatives also entered into an agreement that makes corporate officers liable for unpaid contributions. In 2010, Wallternatives went out of business and its bond was not renewed.

In January 2005, Nieto Sr. incorporated an entity called Sunrise. Nieto Sr. was the sole president and only director on the board of directors. Sunrise was never licensed to any business and never in fact conducted any business. Nieto Sr. used Sunrise to open a bank account from which he could write checks.

In September 2008, Nieto Jr. began painting and doing work as GQC. In October 2009, after a year of doing work as a sole proprietorship, Nieto Jr. decided it was in his best interest to incorporate, and he formed GQC, Inc. All of the members of the Nieto family are directors of GQC, Inc.

In January 2010, Esquivel left Wallternatves and Nieto Sr. and Bammer became 100% owners. The instant lawsuit results from the entanglement of Wallternatives, GQC, GQC, Inc., and Sunrise along with the varying levels of alleged management, ownership and control of those entities

by Nieto Sr., Nieto Jr., and Bammer. The alleged alter egos are important because plaintiffs' complaint is premised on the allegation that the Nieto family management structure fraudulently transferred Wallternatives' labor agreements in an effort to circumvent Wallternatives' contracts with union labor. According to plaintiffs, Nieto family members used their ownership and management authority to shift Wallternatives' contracts and labor to one of the alleged alter ego companies. Nieto family members then used the alter ego companies' assets, bank accounts or money to hide Wallternatives' obligations from the union. In essence, plaintiffs allege that Wallternatives was unhappy with the contract it had with the labor unions. Therefore, according to plaintiffs, the Nieto family used GQC, GQC, Inc., and Surnrise to supplant Wallternatives. Wallternatives' previous employees began working for the alter egos, thereby using union labor without being a signatory to any union contracts.

## II.   Discussion

### A.   Standard of Review

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential

1  element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to
2  make a showing sufficient to establish an element essential to that party's case on which that party
3  will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party
4  fails to meet its initial burden, summary judgment must be denied and the court need not consider
5  the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

6      If the moving party satisfies its initial burden, the burden then shifts to the opposing party
7  to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith
8  Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing
9  party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the
10 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions
11 of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th
12 Cir. 1987).

13     At summary judgment, a court's function is not to weigh the evidence and determine the
14 truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*,
15 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable
16 inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is
17 merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at
18 249–50.

19     **B.    Analysis**

20     When a party alleges that a corporation is being used as the alter ego of another corporation
21 in order to avoid union obligations, that party must establish two elements: (1) that the two
22 corporations actually were a single employer; and, (2) the intent to avoid union obligations "through
23 a sham transaction or a technical change in operations." *U.A. Local 343 United Ass'n of
24 Journeyman & Apprentices of Pluming & Pipefitting Indus. of U.S. and Canada, AFL-CIO v. Nor-
25 Cal Plumbing, Inc.*, 48 F.3d 1465, 1471-72 (9th Cir. 1994).

26     Further, the single employer test consists of the following four factors: common ownership;
27 common management; interrelation of operations; and, centralized control of labor operations. *Id.*

28

**James C. Mahan**
**U.S. District Judge**

- 5 -

1  "No one factor is controlling nor need all criteria be present. The most important factor is
2  centralized control of labor relations, which can be demonstrated either by showing common control
3  of day-to-day labor matters, or by showing that the person in charge of the union company's labor
4  relations made the decision that the second company would be non-union." *Id.*

### i. Sunrise

Plaintiffs assert that Sunrise is an alter ego of Wallternatives and meets the two-part *UA Local* test. For the single employer test, plaintiffs attempt to prove that both Nieto Sr. and Bammer wrote checks from the Sunrise account and that some of those checks were actually used to conduct Wallternatives' business and operations. Plaintiffs further provide evidence that the Sunrise checking account was used by individual Nieto family members for their personal obligations as well as for Wallternatives obligations. For the fraud element, plaintiffs have submitted facts that Sunrise account checks were written in an attempt to hide Wallternatives' obligations from the union.

Defendants marshal countering evidence that Sunrise is not an alter ego of Wallternatives. Sunrise never had any employees, a license to do business or as a contractor, and never did any work. Defendants further presented facts that raise doubts about the amount of control, discretion, and authority the individual Nieto family members could exercise when writing Sunrise checks. Finally, defendants provide legitimate reasons for uses of the Sunrise account. Under the facts presently before for the court, a reasonable trier of fact could come out either way on the issue of whether Sunrise was an alter ego for Wallternatives. Genuine issues of material fact exist, and summary judgment is denied on this issue.

### ii. GQC, Inc.

Both plaintiffs and defendants agree that for a short time in 2010, Nieto Sr. attempted to funnel GQC contracts to GQC, Inc. Plaintiffs generally provide facts that GQC and GQC, Inc. were so intertwined after the incorporation that there was never any meaningful difference between the two, and that both GQC and GQC, Inc. were the alter ego of Wallternatives. Defendants counter with evidence that GQC, Inc. never conducted any business, never hired or used any employees, and never sought or received a license to do business.

James C. Mahan
U.S. District Judge

- 6 -

1   The court finds that both plaintiffs and defendants have presented evidence that creates a genuine issue of material fact. Therefore, summary judgment is denied on the issue that GQC, Inc. was an alter ego of Wallternatives.

### iii.   GQC

Plaintiffs devote the bulk of their motions to proving that GQC was an alter ego formed and used to circumvent Wallternatives' obligations to the union. Plaintiffs first rely on *J.M. Tanaka Constr., Inc. v. N.L.R.B.*, 675 F.2d 1029 (9th Cir. 1982), for the proposition that family members in different companies can be treated as common owners, managers and joint controllers for alter ego purposes.

Plaintiffs provide evidence that Nieto Sr., Nieto Jr., and Bammer were all part of the same family, served as managers, and had controlling interests in all the relevant companies. Plaintiffs, also, submit evidence that GQC and Wallternatives shared office space and supplies. Most importantly, plaintiffs produce evidence of the alleged interrelated operations between GQC and Wallternatives, and that the Nieto family members used GQC to complete Wallternatives projects and contracts to avoid union obligations.

Defendants, likewise, dedicate the majority of their motions to counter and provide rebutting facts that GQC was an alter ego of Wallternatives. Defendants begin by providing evidence that GQC never had the requisite intent to defraud the union because GQC was formed and began business seventeen months before Nieto Sr. and Bammer had a 100% interest in Wallternatives. Defendants provide substantial evidence that only Nieto Jr. had an ownership interest in GQC, so there could have been no common ownership.

Defendants provide evidence that only Nieto Jr. had a managerial role in GQC, while Nieto Sr. performed only estimator duties and Bammer performed only administrative duties. Most important, defendants provide evidence that there was not an interrelation of operations nor centralized control of labor relations. Defendants provide evidence that GQC and Wallternatives had different clients and that at all pertinent dates no single person controlled labor relations in both companies at the same time.

James C. Mahan
U.S. District Judge

- 7 -

Finally, defendants provide evidence that to the extent Nieto Sr. attempted to pass on Wallternatives work to GQC, it was because Esquivel (the other half owner of Wallternatives) had filed for bankruptcy and the bankruptcy was affecting Wallternatives' business. Nieto Sr., according to evidence by defendants, gave companies that had entered into contracts with Wallternatives the option to use either Wallternatives or GQC to complete the projects. However, according to facts presented by defendants, Nieto Sr. never attempted to circumvent Wallternatives' union obligations by surreptitiously having GQC perform the contracts.

Together, both sides have produced a mountain of evidence supporting and countering the allegations that GQC, GQC. Inc., and Sunrise were alter egos of Wallternatives. These issues are a deeply fact intensive inquiry and cannot be resolved by summary judgment as a matter of law.

      **iv.    Nieto Family**

Each Nieto family member appears to currently have or, at some point in the past, had some interest, ownership and management authority in each of the four entities – GQC, GQC, Inc., Sunrise, and Wallternatives. The precise level of involvement and control and whether the purpose of that involvement and control was to avoid the union obligations of Wallternatives is a deeply fact intensive inquiry that is not suitable to summary judgment.

      **v.    Bammer's alleged breach of contract**

Defendant Bammer seeks summary judgment in plaintiffs' breach of contract claim against Bammer. In Nevada, to pierce the corporate veil and prove an individual liable, the alter ego doctrine requires that the following must be proven: "(1) The corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable form the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction a fraud or promote injustice." *LFC Marketing Group, Inc. V. Loomis*, 116 Nev. 896, 904 (Nev. 2000). Additionally, the court will consider commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities. *Id.* at 247.

**James C. Mahan**
**U.S. District Judge**

- 8 -

Plaintiffs have submitted evidence that Bammer was an owner and manager of Wallternatives. Plaintiffs further submit evidence that Bammer commingled funds between Sunrise and Wallternatives and that Bammer failed to observe corporate formalities between Wallternatives and Sunrise. Plaintiffs assert that Bammer used Sunrise and the Sunrise checks and accounts in such a way that she commingled assets between all of the relevant companies - GQC, GQC, Inc., Sunrise, and Wallterantives. Defendants counter by submitting substantial evidence that all of Bammer's actions were either perfectly legitimate or much more innocuous than suggested by plaintiffs. Genuine issues of material fact predominate on this issue and summary judgment is denied.

### vi. Plaintiffs' alternative motion for full discovery

Plaintiffs' alternative motion seeking full discovery is denied. Both parties have sufficient evidence to proceed forward and negotiate a settlement or elect to go to trial.

## III. Conclusion

As explained above, plaintiffs and defendants have each submitted evidence that establishes a genuine issue of material fact as to which, if any, of the Nieto family businesses were an alter ego for Wallternatives. As a result, this court must deny each party's summary judgment claims.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants' motion for summary judgment (doc. #103) be, and the same hereby is, DENIED.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiffs' counter motion for summary judgment (doc. #109) be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that plaintiffs' motion seeking leave to file a supplemental exhibit (doc. #144) is denied as moot in light of the stipulation.

DATED August 21, 2012.

_____
UNITED STATES DISTRICT JUDGE